FILED

2026 Mar-10 AM 10:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

JOE ROBINSON,

     **Plaintiff,**

v.                                              Case No. 3:24-cv-1635-HDM

ALABAMA DEPARTMENT OF
VETERANS AFFAIRS, *et al.*,

     **Defendants.**

## MEMORANDUM OPINION

Plaintiff Joe Robinson sues Defendants Alabama Department of Veterans Affairs ("ADVA"), Jeffrey Newton, W. Kent Davis, Timothy Edgil, and Peggy Williams for racial discrimination in hiring. (Doc. 1). He asserts a Title VII race discrimination claim against ADVA and Section 1983 race discrimination claims against Davis, Newton, Edgil, and Williams. *Id.* This case is before the court on Defendants' motion for summary judgment, (doc. 24), which, for the reasons stated below, the court **GRANTS**.

## BACKGROUND

In September 2023, seven individuals, including Plaintiff Joe Robinson and the eventual hires, Adam Carter and Gilbert Gutierrez, interviewed for two open positions with Defendant Alabama Department of Veterans Affairs ("ADVA"). (Doc.

25-1 at 6). The vacancies were both for the position of Assistant Veteran Services Officer (the "Position"). *Id.*, ¶ 10; (Doc. 25-15 at 53–55).

Carter, a white male, served for over ten years as a jet mechanic in the United States Air Force where he interacted with pilots and senior leadership. (Doc. 25-2, ¶ 3). After his honorable discharge, Carter worked for Navistar, North American Lighting, and Alabama Stone. *Id.* At Alabama Stone, Carter frequently interacted with individuals touring the mill. *Id.* At the time of his hiring, Carter had also worked as a Reserve Franklin County Sheriff's Deputy since 2017, the chaplain for the Reserves for the past six years, and a youth minister for Branches Church for the past five years. *Id.* Candidates were scored by ADVA interviewers Edgil and Williams, (doc. 25-4, ¶ 11), and Carter's average interview score of eighty ranked the highest of all seven interviewees, (doc. 25-16 at 53). Carter's higher scores related to his responses concerning interpersonal skills, high pressure situations, community service, and overall career objectives. *Id.* at 21–22. Each question was scored out of seven, and Carter's lower scores included a four to his response to work history and educational background questions and a three in response to whether he had formal training in counseling others on their benefits. *Id.*

Gutierrez, a Hispanic male, served in the U.S. Army as a Team Leader in combat engineer missions support from October 2003 until March 2011. *Id.* at 32. After his honorable discharge, Gutierrez owned an auto detailing company while

2

working for four years as a Lead Veteran Advocate/Housing Specialist for WestCare California, in which position he conducted group and individual counseling sessions and advocated for veterans. *Id.* He then worked for the California Department of Social Services ("California DSS") as a Job Specialist, providing case management to assist clients with achieving their goals. *Id.* Gutierrez's average interview score of 67.5 ranked the second highest of all seven interviewees. *Id.* at 53. Gutierrez received higher scores on questions related to his work history, educational background, community service, public speaking, and teamwork capabilities. *Id.* at 28–29. Gutierrez's lower scores included threes to his responses on typing skills and whether he had formal training in counseling others on their benefits. *Id.*

Mr. Robinson, a seventy-one-year-old black male, holds a high school diploma, a Bachelor of Science in Urban Planning Studies (1979), and a Master of Business Administration (2015). (Doc. 25-22 at 25–34; 52–54). He also completed various military education programs including a Certificate of Accomplishment in Financial Management, Equal Opportunity coursework, Program Activity Manager Course Certification, Unit Clerk Course Certification, Unit Administration School, and Adjutant General coursework. *Id.* He served in the U.S. Army for twenty years before retiring with an honorable discharge in 2004. *Id.* at 30, 53. During his military tenure, he served as a Non-Commissioned Officer-in-Charge, a Security Officer, Fire Warden, and a member of the Military District of the Washington Court-Martial

3

Board. *Id.* at 52–53. From 1990 to 2004, he served as a Real Estate Non-Commissioned Officer and Directorate Non-Commissioned Officer-in-Charge in the U.S. Army, including assignments with the Active, Reserve, and National Guard components throughout the United States. *Id.* He also served as a primary advisor within all U.S. states and territories in relation to real estate issues and related rules, regulations, and policies. *Id.*

Following his Army retirement, he spent ten years working as a program coordinator with Management Support Technology, Inc., a senior analyst with CALIBRE, a financial analyst with the Defense Threat Reduction Agency, a resource manager with Defense Group, Inc., and a resource manager with Booz Allen Hamilton. *Id.* at 29. For the following seven years, he worked for the Veterans Benefit Administration of the Federal Department of Veterans Affairs as a financial administrative specialist, in which role he was responsible for accounting duties related to general operating expenses, vocational rehabilitation employment programs, and minor construction funds. *Id.* He managed three employees. (Doc. 25-21 at 14). In this role, he also communicated with veterans who came to the intake department for benefits in direct face-to-face "customer care" and "performed a variety of different duties to assist veterans with their needs." *Id.* at 15. The intake department often called him to assist with upset, irate, and disorderly individuals. *Id.* at 4, 15.

Defendant Newton, who was the Assistant Commissioner of Operations and the Chief of Staff of the State of Alabama Department of Veterans Affairs, reviewed each applicant to ensure that applicants met the minimum criteria for an interview. (Doc. 25-1, ¶ 12; Doc. 25-6, ¶ 12). Seven qualified candidates—five white individuals, one black individual, and one Hispanic individual—were given interviews. (Doc. 25-1, ¶ 16; *see also* Doc. 25-15 at 56–100). These seven candidates included Carter, Gutierrez, and Mr. Robinson. (Doc. 25-15 at 56–100).

Newton did not personally interview candidates but, instead, delegated that task to Edgil and Williams. (Doc. 25-1, ¶ 13). Newton believed the interview was the most important step in filling the Positions because of the necessary customer service skills. (Doc. 25-6, ¶ 11). Newton gave discretion to Williams and Edgil in assessing the interviewees' ability to relate to other people. *Id.* In preparation for interviews, ADVA provided Williams and Edgil with questions and a candidate score sheet. (Doc. 25-1, ¶ 12; Doc. 25-4, ¶ 11). Williams and Edgil scored candidates based on their responses. (Doc. 25-4, ¶ 11). At the conclusion of the interviews, Williams and Edgil tallied the scores, ranked the candidates, and sent the application packets, rankings, score sheets, and recommendations for hire (the top scorers) to Newton. (Doc. 25-4, ¶¶ 11–12). Newton reviewed Williams's and Edgil's math and then forwarded his recommendation, based on Williams's and Edgil's recommendation, to Davis for his final decision. (Doc. 25-6, ¶¶ 14–15; Doc. 25-17 at 14). Davis read

all of the candidates' materials, looked them up to see if they had an online presence, and then approved an offer of employment to the two individuals whom Williams and Edgil recommended. (Doc. 25-3, ¶ 14). Those two individuals were Carter and Gutierrez. (Doc. 25-4, ¶¶ 11–13; Doc. 25-16 at 53). Mr. Robinson was ranked third. (Doc. 25-16 at 53).

On November 28, 2023, Mr. Robinson contacted the EEOC regarding his non-selection for the Position and his belief that ADVA discriminated against him because of his age and race. (Doc. 25-22 at 43–46). On March 18, 2024, an EEOC investigator, Richard Grooms, interviewed Mr. Robinson and created a charge of discrimination, which Mr. Robinson digitally signed (the "March Charge"). (Doc. 25-25; Doc. 25-22 at 46). The March Charge stated that Mr. Robinson applied for a position with ADVA, interviewed on September 29, 2023, and received a letter dated October 10, 2023, informing him of his non-selection. (Doc. 25-22 at 44–46). Mr. Robinson did not know who ADVA selected but believed he was not hired because of his age and race. (Doc. 25-25; Doc. 25-22 at 46).

Grooms informed Mr. Robinson of his right to file the charge and explained that if the EEOC dismissed it, Mr. Robinson would receive a Dismissal and Notice of Right to Sue permitting him to file a lawsuit in federal court within ninety days of receipt. (Doc. 25-25). Grooms cautioned Mr. Robinson that failure to file suit within that ninety-day period would result in the loss of his claim. *Id.* After receiving

6

this information, Mr. Robinson elected to proceed with filing the March Charge. *Id.*

The EEOC issued a Dismissal and Notice of Right to Sue on March 19, 2024, (doc.

25-22 at 48), which Mr. Robinson downloaded that same day, (doc. 25-24).

On April 1, 2024, Mr. Robinson filed and digitally signed a second Charge of

Discrimination (the "April Charge"). (Doc. 25-22 at 52–54). The April Charge

alleged the same discrete act of discrimination as the March Charge, claiming that

Mr. Robinson applied for the Position, interviewed on September 29, 2023, received

a letter dated October 10, 2023, informing him of his non-selection, and that he was

unaware of who ADVA selected but believed he was not hired because of his age

and race. *Id.* It also stated that Mr. Robinson met all qualifications for the Position,

set forth over a page of Mr. Robinson's qualifications and relevant educational and

work history, explained the interview process in detail, and noted that Mr. Robinson

had been told he had done very well in the interview and had earned one of the

highest interview scores. *Id.* Finally, it set forth a statement by an employee of the

Disabled Veterans Outreach Program—a third party—that the ADVA office to which

Mr. Robinson applied had never hired a minority before, and stated that, based upon

information and belief, the two individuals who were hired were not African-

American. *Id.*

On April 10, 2024, ADVA emailed the EEOC and noted that it had already

issued a Notice of Right to Sue to Mr. Robinson for the March Charge "regarding

the same allegations" as the April Charge. (Doc. 28-3 at 2). ADVA questioned why

the matter was being readdressed and whether the March and April charges were

duplicative. *Id.* The EEOC corresponded with both Mr. Robinson and ADVA

regarding the matter and Robinson responded that,

> The first Charge was drafted and filed by EEOC intake and consisted
> of only four sentences which omitted key pieces of evidence such as
> Robinson's overwhelming qualifications, the substance of the interview
> process, the direct evidence statement made by Selena Ricks of the
> Disabled Veterans Outreach Program in Montgomery that the
> Lauderdale County Department of Veterans Affairs had never hired a
> minority before. As such, it appears that the initial Charge did not
> accurately reflect the underlying facts of the matter and it was never
> actually investigated with the RTS Notice being issued within 24 hours
> after the Charge was filed.

*Id.* at 1. Robinson requested that upon his submission of three pages of more detailed

factual allegations, the EEOC reconsider and conduct an investigation into the events

as now "fully" submitted to the agency. *Id.* Thereafter, the EEOC issued a "[l]egal

review approved" status, (doc. 25-18 at 15), followed by a "[s]upervisor review

approved" status, *id.* at 17. The EEOC then proceeded with fully processing and

investigating the April Charge, as requested by Mr. Robinson, including conducting

mediation with the parties. *Id.* at 2–15. The EEOC issued a second Notice of Right

to Sue on August 30, 2024. (Doc. 25-26).

Mr. Robinson filed his Complaint on November 25, 2024. (Doc. 1). The

Complaint asserts five causes of action: (I) a Title VII race discrimination claim

against ADVA; and (II)–(V) Section 1983 race discrimination claims against Davis, Newton, Edgil, and Williams. *Id.*

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether the movant has met this burden, courts must view the evidence in the light most favorable to the non-movant." *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023). A genuine dispute of material fact exists when "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment always bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

There are two main issues in this case. First, did Mr. Robinson timely file his Title VII claims? And second, are Defendants entitled to judgment as a matter of law on the merits? Defendants are entitled to summary judgment on each of these issues and thus on the entire case.

## I.    Title VII

As to the first of these two issues, because the March Charge, not the April Charge, started the ninety-day clock—and because he filed outside of that initial ninety-day window— Mr. Robinson did not timely file his Title VII claims. And the facts of this case do not justify tolling the ninety-day filing deadline.

### A. Plaintiff Did Not Timely File His Title VII Claims

Mr. Robinson's Title VII claim fails because he filed the Complaint 251 days after receiving the March 19, 2024, Notice of Right to Sue. (*See* Doc. 25-22 at 48; Doc. 1). To bring a viable claim under Title VII in Alabama, a plaintiff must file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment practice and must file a civil action within ninety days of receiving a right-to-sue letter from the EEOC. 42 U.S.C. §§ 2000e-5(e)(1), (f)(1); *Cornett v. Ala. Dep't of Transp.*, 828 F. App'x 565, 567 (11th Cir. 2020); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1214 n.2 (11th Cir. 2001) (noting Alabama is a non-deferral state where the 180-day deadline applies).

If a plaintiff files multiple EEOC charges resulting in multiple right-to-sue letters, the date on which the ninety-day time limitation begins to run depends on whether the EEOC officially revoked and reconsidered its first determination. *See* 29 C.F.R. 1601.21(b), (d). "The relevant regulations, 29 C.F.R. 1601.21(b) and (d), contemplate that '[i]n cases where the Commission decides to reconsider a dismissal

or a determination finding reasonable cause to believe a charge is true, a notice of intent to reconsider will promptly issue.'" *Gitlitz v. Compagnie Nationale Air France*, 129 F.3d 554, 557 (11th Cir. 1997) (quoting 29 C.F.R. 1601.21(b)(2)). If the EEOC issues a second Notice of Right to Sue without revoking the first, the second is invalid. *See Stamper v. Duval Cnty. Sch. Bd.*, 863 F.3d 1336, 1340 (11th Cir. 2017). This is because "[t]he regulation contemplates the issuance of a new notice of the right to sue only when the original notice was revoked, which means that the regulation does not allow the Department of Justice to issue a new notice of the right to sue when the original notice was *not* revoked." *Id.*

If there was no revocation and notice of reconsideration, "[w]here a plaintiff files multiple EEOC charges, discriminatory acts alleged by the plaintiff in the later charge may form the bases of claims, but only if those acts were not mentioned in the earlier charge." *See Rickard v. Costco Wholesale Corp.*, No. 1:21-cv-1645-LMM-JSA, 2023 WL 11959811, at *12 (N.D. Ga. Jan. 30, 2023), *report and recommendation adopted*, No. 1:21-cv-1645-LMM, 2023 WL 11959810 (N.D. Ga. Mar. 17, 2023) (internal quotation marks and brackets omitted). Where the EEOC issues multiple notices based on two charges involving "exactly the same facts," whether an action is "time barred must be determined with reference to only the first Notice of Right to Sue." *Id.* (citing *Lo v. Pan Am. World Airways, Inc.*, 787 F.2d 827, 828 (2d Cir. 1986)). "[A] Title VII plaintiff cannot be permitted to extend the 90-day

period by repeatedly filing broad, duplicative charges with the EEOC and obtaining multiple right to sue letters." *Callahan v. Emory Healthcare, Inc.*, No. 1:21-cv-1367-WMR-JSA, 2022 WL 18927486, at *10 (N.D. Ga. Nov. 10, 2022) (internal brackets omitted), *report and recommendation adopted*, No. 1:21-cv-1367-WMR-JSA, 2023 WL 2334987 (N.D. Ga. Feb. 16, 2023), *aff'd*, No. 23-10604, 2024 WL 3027684 (11th Cir. June 17, 2024).

Here, although the EEOC did consider Mr. Robinson's April Charge, it never issued a notice of reconsideration for the March Charge. Nor does the record indicate that it ever revoked the first Notice of Right to Sue that it issued to Mr. Robinson following its consideration of the March Charge. The EEOC's informal email communications with Mr. Robinson's counsel are insufficient under Section 1601.21 to constitute reconsideration. *See Stamper*, 863 F.3d 1336, 1340 (11th Cir. 2017) ("[T]he regulation does not allow the Department of Justice to issue a new notice of the right to sue when the original notice was *not* revoked."). Thus, the second Notice could only reset the ninety-day clock if Mr. Robinson's second EEOC charge alleged a discrete act that is different from the one Mr. Robinson alleged in his first EEOC charge. *Rickard*, 2023 WL 11959811, at *12.

Although the April Charge contains additional information—such as Mr. Robinson's employment and educational history, names of interviewers, and a statement made by a third party regarding ADVA's hiring history—it is legally

duplicative of the March Charge. This is because both the March and April Charges allege discrimination based on the same discrete act: ADVA's failure to hire Mr. Robinson for either of the Positions in September 2023. (*See* Doc. 25-22 at 52–54). According to an internal EEOC email, the April Charge alleged "the **exact same** fact pattern and allegations giving rise to [the March Charge]." (Doc. 28-1 at 2 (emphasis in original)). Because the April Charge lacks alleged discriminatory acts that differ from the March Charge, it does not put forth a new claim. *See Rickard*, 2023 WL 11959811, at *12. As such, Mr. Robinson's Title VII claim is time-barred because the March 2024 Notice of Right to Sue controls, and Mr. Robinson filed the Complaint 251 days after receipt of that Notice. Mr. Robinson cannot extend his time for filing his Complaint by filing multiple charges. *See Callahan*, 2022 WL 18927486, at *10.

### B. Plaintiff is Not Entitled to Equitable Tolling

Mr. Robinson argues that, even if he did not timely file his Title VII claim, the ninety-day limitation should be equitably tolled, allowing him to proceed with his claim. (Doc. 27 at 29–34). Eleventh Circuit precedent recognizes "three distinct situations in which the Title VII limitation periods may be equitably tolled." *Jones v. Wynne*, 266 F. App'x 903, 906 (11th Cir. 2008). Mr. Robinson invokes two of these: (1) tolling is allowed when a defendant concealed facts that support the plaintiff's cause of action, until such time as the plaintiff knew or should have known

of these facts; and (2) tolling is allowed when the EEOC misleads a complainant about the nature of his rights under Title VII. *See id.* "[T]he employee bears the burden of proving that equitable tolling is appropriate." *Jones*, 266 F. App'x at 905. It "is an extraordinary remedy which should be extended only sparingly." *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1242 (11th Cir. 2004).

As to the first of these two situations in which the limitations period may be tolled, Mr. Robinson argues that ADVA concealed facts regarding the identity, race, and qualifications of Carter and Gutierrez when it failed to provide Robinson with his requested open records materials in direct violation of an Executive Order of the State of Alabama which required production within fifteen to forty-five days. Mr. Robinson indicates that in so doing, ADVA misled him into allowing his time to lapse.

There are two issues with this argument. First, although it is true that ADVA failed to respond to Mr. Robinson's open records request within the required fifteen to forty-five days, (*see* doc. 25-17 at 29–31), ADVA did in fact email Mr. Robinson on February 1, 2024, stating, "we are preparing items according to your public records request regarding our Lauderdale County Veteran Service Officer selections. Please confirm your email address," (doc. 25-22 at 41). Although this email was sent to an email address from which Mr. Robinson had previously contacted ADVA, *see id.* at 38, Mr. Robinson never responded, *see id.* at 41; (doc. 25-17 at 30). This was

14

a full month and a half before the EEOC issued Mr. Robinson its first Notice of Right to Sue on March 19th. Thus, Mr. Robinson has not met his burden of showing that it was ADVA's concealment of facts,[1] rather than his own failure of diligence, that resulted in ADVA not fulfilling his open records request within the EEOC's ninety-day window.

Second, Mr. Robinson's argument—that because of ADVA's alleged concealment, the EEOC's second Notice of Right to Sue should control—falls flat. Mr. Robinson filed his second EEOC charge on April 1, 2024. This was less than two weeks after the EEOC issued its first Notice of Right to Sue, and this second charge still did not contain the information Mr. Robinson requested in his open records request. Mr. Robinson's argument that the second Notice should control rests on the premise that it would be inequitable for the first Notice to control because ADVA had not provided relevant information at the time that Mr. Robinson created the first charge. But because ADVA still had not provided that information at the time that the second charge was filed—and it appears from the record that Mr. Robinson had made no further attempt to acquire that information before filing the second charge, (*see* Doc. 25-22 at 38–42)—it would be no more equitable, on the

---

[1] ADVA disputes that it concealed any facts from Mr. Robinson, contending that fulfillment of Mr. Robinson's claim was delayed by several factors: November (the month in which the claim was filed) is their busiest month; ADVA was undertaking several other large projects, including building a new veterans' home and expanding a veterans' cemetery; the holidays; and several people within the agency had COVID. *See* Exhibit P at 30–31.

basis of withheld information, for the second rather than the first Notice to control. Thus, the first exception—concealment of facts—does not apply.

Based on the second of these two situations in which the limitations period may be tolled—when the EEOC misleads a complainant about the nature of his rights under Title VII— Mr. Robinson argues that the EEOC's communications with Mr. Robinson misled him into believing that a second Notice of Right to Sue would govern. (Doc. 27 at 34). This argument is unpersuasive because, generally, "[a] second Notice tolls the limitation period only if the EEOC issues such Notice pursuant to a reconsideration on the merits under 29 C.F.R. § 1601.21(b), (d)." *Santini v. Cleveland Clinic Fla.*, 232 F.3d 823, 825 (11th Cir. 2000). And "[a]s a matter of law, receipt of a second EEOC Notice does not constitute grounds for equitable tolling where a party has actual knowledge of the first Notice." *Id.* (citing *Ball v. Abbott Advertising, Inc.,* 864 F.2d 419, 421 (6th Cir. 1988) (noting that "[a]ctual notice destroys any possible basis for applying the 'equitable tolling' doctrine")).

Here, Mr. Robinson knew of the first Notice of Right to Sue. And the EEOC had neither revoked the first Notice nor issued a formal notice of reconsideration before issuing the second Notice. Thus, Mr. Robinson is not entitled to equitable tolling. Indeed, if issuance of a second Notice of Right to Sue without reconsideration and revocation under 29 C.F.R. § 1601.21 entitled a plaintiff to

equitable tolling, then Section 1601.21's reconsideration and revocation requirements would be rendered meaningless, as would the Eleventh Circuit's precedent in *Stamper* and *Gitlitz* holding that the first Notice, not the second, controls for purposes of the ninety-day limitation. *See* Section I, *supra*.

Because Mr. Robinson did not timely file his Title VII claims, and because he is not entitled to equitable tolling, his Title VII claims must be dismissed as a matter of law.[2]

## II.    EPC, Section 1981, and Section 1983 Race Discrimination

Mr. Robinson also sues Edgil and Williams (the interviewers) and Newton (the supervisor) for race-based discrimination under the Equal Protection Clause of the Fourteenth Amendment and under 42 U.S.C. § 1981, both by way of 42 U.S.C. § 1983. (Doc. 1 at 16–24).[3] Mr. Robinson argues that Edgil and Williams directly discriminated against him by giving him lower interview scores than he deserved, *id.* at 20–21, and he argues that Davis and Newton are liable under the theory of

---

[2] Had Robinson timely filed his Title VII claims, they would have been dismissed for the same reason as his Equal Protection Clause and Section 1981 and 1983 Race Discrimination claims. *See Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 n.6 (11th Cir. 2018) ("Employment discrimination claims against state actors for violation of the Equal Protection Clause are cognizable under § 1983, and are subject to the same standards of proof and use the same analytical framework as discrimination claims brought under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.").

[3] Mr. Robinson withdrew his Section 1983 claims against Davis in his individual capacity. (Doc. 27 at 44 n.22). But as Mr. Robinson continues to include Davis in various arguments, the court also includes Davis in its holdings to clarify that those holdings apply to any claims that have not been withdrawn against him.

"cat's paw" liability, *see Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999), because Davis and Newton simply rubber-stamped Edgil and Williams's decisions, thus serving as a conduit for their discriminatory animus, (*see* doc. 27 at 38–39). Without an underlying discriminatory action, of course, Davis and Newton cannot be liable under a cat's paw theory, so the court will first address Edgil and Williams.

For Mr. Robinson's claims to survive summary judgment, he must present sufficient facts to permit a reasonable factfinder to rule in his favor, which requires a showing that ADVA acted with discriminatory intent. *See Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (en banc). Discriminatory intent can be established in multiple ways. Where, as here, a plaintiff seeks to prove intentional discrimination through circumstantial evidence of the employer's intent, the court generally applies some version of the familiar tripartite burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. Alternatively, a plaintiff can prove discriminatory intent by "present[ing] a convincing mosaic of circumstantial evidence that would allow a [factfinder] to infer intentional discrimination." *Lewis*, 934 F.3d at 1185 (internal quotation marks and ellipses omitted).

### A. *McDonnell Douglas* Burden-Shifting Framework

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1527–28 (11th Cir. 1997). Once a plaintiff establishes the requisite prima facie case, the defendant has the burden of producing a legitimate, non-discriminatory reason for the challenged employment action. *See, e.g.*, *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 (1981)), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019). The employer's burden is "exceedingly light." *Holifield*, 115 F.3d at 1564. This burden is one of production, not persuasion, and, consequently, the employer "need only produce evidence that *could* allow a rational fact finder to conclude that the [challenged] employment decision was not made for a discriminatory reason." *Davis v. Qualico Misc., Inc.*, 161 F. Supp. 2d 1314, 1321 (M.D. Ala. 2001) (emphasis added) (internal brackets omitted). *See also Kondrak v. Principi*, 161 F. App'x 817, 819 (11th Cir. 2005). Once an employer satisfies its burden of producing a legitimate, non-discriminatory reason for the employment action at issue, the next step of the *McDonnell Douglas* framework requires the plaintiff to establish that the proffered reason was not the true reason for the employment action, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing

19

that the employer's proffered explanation is unworthy of credence." *Burdine*, 450

U.S. at 256 (citing *McDonnell Douglas*, 411 U.S. at 804–05). *See also Combs*, 106

F.3d at 1528.

Defendants concede that Mr. Robinson can establish a prima facie case of

discrimination under the *McDonnell Douglas* framework because (1) he is a member

of a protected class (African American); (2) was qualified for the position; (3) was

not selected for the position; and (4) the individuals selected for the two vacant

positions were outside Mr. Robinson's protected class. (Doc. 26 at 23–24); *See*

*Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 n.7 (11th Cir. 2018) (listing the

elements of a prima facie case).

Because Mr. Robinson established a prima facie case of discrimination, the

burden of production shifts to ADVA to "rebut the presumption of racial

discrimination raised by plaintiff's prima facie case by presenting evidence that [he]

was rejected, or that [Carter and Gutierrez were] chosen, for a legitimate,

nondiscriminatory reason." *Mims v. TVA*, No. 5:13-cv-672-CLS, 2015 WL 6081200,

at *6 (N.D. Ala. Sept. 23, 2015). A legitimate, non-discriminatory reason is one that

would "motivate a reasonable employer." *Hilliary v. FlightSafety Int'l*, 778 F. App'x

835, 839 (11th Cir. 2019). ADVA "need not persuade the court that it was actually

motivated by the proffered reason, but need only present evidence raising a genuine

issue of fact as to whether it discriminated against [Mr. Robinson]." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010).

The Eleventh Circuit has held that "[w]here 'several candidates are well-qualified for a single position, the employer's testimony that it chose the person it thought best qualified' is ordinarily sufficient" to qualify as a legitimate, non-discriminatory reason for the adverse employment action. *Cotton v. Enmarket, Inc.*, No. 19-14000, 2020 WL 2078288, at *2 (11th Cir. 2020) (internal ellipses omitted) (quoting *Smith v. Horner*, 839 F.2d 1530, 1539 (11th Cir. 1988)). Specifically, courts in the Eleventh Circuit consistently hold that selecting a particular job applicant based on his or her higher scores during the selection process is a legitimate, non-discriminatory reason for not hiring another candidate. *See, e.g.*, *Rodriguez v. Sec'y, U.S. Dep't of Homeland Sec.*, 518 F. App'x 653, 656 (11th Cir. 2013) (finding TSA's reason for not selecting plaintiff legitimate and non-discriminatory where TSA selected to fill a position candidates who "had higher combined matrix and interview scores—the sole criteria TSA utilized in [its] promotion process"); *Fike v. Nichols Aluminum-Ala., LLC*, No. 14-cv-19-KOB, 2015 WL 996600, at *4 (N.D. Ala. Mar. 5, 2015) (finding that defendant met its burden to articulate a legitimate, non-discriminatory reason for not promoting plaintiff "by explaining that it promoted Mr. Hughes over [plaintiff] based upon Mr. Hughes' superior score on the scoring matrix"); *Rogers v. Atlanta Gas Light Co.*, No. 1:04-cv-3144-RWS-GGB, 2006 WL

8431750, at *7 (N.D. Ga. Mar. 22, 2006) ("[Defendant] asserts that it did not select Mr. Robinson for one of the foreman positions . . . because [the selectees] had higher Total Ranking Scores than Plaintiff, which is a legitimate, non-discriminatory reason for not hiring Plaintiff."), *report and recommendation adopted*, No. 1:04-cv-3144-RWS, 2007 WL 9700617 (N.D. Ga. Mar. 5, 2007).

Defendants argue that their subjective interview scores demonstrate a legitimate, nondiscriminatory reason for not hiring Mr. Robinson. (*See* Doc. 26 at 24–29). In response, Mr. Robinson relies heavily on *Bradley v. Pfizer, Inc.*, and the Eleventh Circuit cases that it cites for the proposition that a subjective interview score is a legitimate, nondiscriminatory reason for not hiring the plaintiff "only if the employer articulates a clear and reasonably specific basis for its subjective assessment." *See* No. 1:08-cv-3437-TWT-GGB, 2011 WL 13168986, at *6 (N.D. Ga. Jan. 21, 2011), *report and recommendation adopted*, No. 1:08-cv-3437-TWT, 2011 WL 13175434 (N.D. Ga. Feb. 14, 2011), *aff'd*, 440 F. App'x 805 (11th Cir. 2011). Here, however, Defendants have articulated such a basis.

Edgil testified his rankings were based on the candidate interviews and that Gutierrez and Carter appeared to have better interpersonal skills and experience dealing with people in crisis. Edgil ranked Carter highly based on "[h]is response to the questions and the written application." (Doc. 25-14 at 33). Edgil considered Carter's experience as a reserve deputy sheriff and youth minister at his church, as

well as his military experience. *Id.* at 34–35. Edgil "thought [Carter] was a good fit for what [ADVA] was looking for. Someone who could listen to problems, to sympathize with their needs, take a positive approach to responding to those needs. Would train well, would learn well." *Id.* at 35. Ultimately, Edgil thought Carter was "a good candidate" who was an "outstanding interviewee." *Id.* As to Gutierrez, Edgil also thought "he interviewed well." *Id.* at 36. Gutierrez impressed Edgil with his prior service with California DSS "dealing with people problems and issues." *Id.* Gutierrez stated that he had experience with upset individuals and "he was able to deal with irate individuals." *Id.*

Edgil also interviewed Mr. Robinson and ranked him third. (*See* Doc. 25-16 at 53). Although he ranked Mr. Robinson highly, Mr. Robinson takes issue with the scores he received on certain questions, especially those concerning his prior work experience. (*See, e.g.*, doc. 27 at 4, 17–18, 40–41). Edgil, though, explained why Mr. Robinson's prior experience was not dispositive: Edgil's impression was that Mr. Robinson was "a middle manager for an agency that did not have any direct contact with the public." (Doc. 25-14 at 55). Further, Edgil scored Mr. Robinson lower because he questioned Mr. Robinson's ability to perform in a lower-level entry position after having held advanced positions. *See id.* at 41. Although Mr. Robinson may disagree with Edgil's reasoning, these are legitimate, non-discriminatory justifications for his scoring.

Williams testified that she thought she scored Mr. Robinson well. (Doc. 25-19 at 26). Williams stated that she considered both the applications and the interviews but "lean[ed] more heavily on the interview and how they interact, how they come across, if they're easy to talk to." *Id.* Williams scored Carter highest because of "how he answered the questions" and the fact that he was "very sincere, very personable." *Id.* at 15. Williams described his interview as "excellent," and she specifically remembered discussing Carter's experience as a youth minister and that he was "proficient in [counseling]." *Id.* Overall, Carter impressed Williams with his time as a reserve sheriff, experience working with his church, and military experience. *Id.*

Similarly, Williams scored Gutierrez highly because he had worked for California DSS and "he really did a great job on the interview." *Id.* at 17. And, ultimately, Williams gave Mr. Robinson a good interview score as well. (Doc. 25-16 at 53). Williams testified that "[Mr. Robinson] was a nice person. He did a good interview, but it's just the other two, to me, the other two gentlemen did better interviews." (Doc. 25-19 at 19).

Edgil's and Williams's explanations constitute sufficient evidence to rebut the presumption of racial discrimination raised by Mr. Robinson, thus shifting the burden back to Mr. Robinson to show pretext.

24

To establish pretext, a plaintiff should direct the court to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (internal quotation marks omitted). Stated differently, the plaintiff must establish that the proffered reason was not the true reason, and that "race was." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993). Thus, the plaintiff cannot establish pretext merely by quarreling with the decision-making process, *see Alvarez*, 610 F.3d at 1266, but instead must show that "the employer's proffered reason was a cover-up for a discriminatory action," *Johnson v. Switch & Data Mgmt. Co. LLC*, 199 F. App'x 834, 835 (11th Cir. 2006) (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)). "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266 (citing *Holifield*, 115 F.3d at 1565).

Mr. Robinson propounds four pieces of evidence to demonstrate pretext.[4] First, he relies on the absence of any objective criteria in the interview scoring process, citing *Watson v. National Linen Service*, 686 F.2d 877, 881 (11th Cir. 1982).

---

[4] Because Robinson does not rely on Selena Ricks's statement regarding ADVA's hiring practices, the court will not address its admissibility. (*See* Doc. 27 (mentioning Ms. Ricks's statement when describing the contents of the April Charge but never using it to show discrimination)); Transcript of Oral Argument at 45 (agreeing that the Ricks statement is not an issue). Nor will the court address the admissibility of statistical evidence, as Robinson asserts no disparate impact claims predicated on statistical evidence. (*See* Doc. 27 at 32 n.18).

In *Watson*, the Eleventh Circuit stated that "[t]he failure to establish fixed or reasonably objective standards and procedures for hiring is a discriminatory practice." *Id.* However, the court in *Watson* was referring to a company's hiring policies that "changed from day to day" and thus were not "fixed." *See id.* Since that 1982 case, the Eleventh Circuit has clarified that "the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII or other federal employment discrimination statutes." *Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001). Indeed, the Eleventh Circuit has acknowledged that "subjective evaluations of a job candidate are often critical," especially in the "increasingly service-oriented economy" where positions require evaluation of personal, not professional, qualities. *Id.* at 1185–86. "It is inconceivable that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation." *Chapman*, 229 F.3d at 1034. Thus, Mr. Robinson's first argument is unpersuasive.

Second, Mr. Robinson relies on his superior qualifications in comparison to those of Carter and Gutierrez. (Doc. 27 at 36). Specifically, Mr. Robinson cites his educational background, his years of experience in the Veterans Benefit Administration, and the human capital and personnel skills he acquired in relation to his MBA and in thirty-five years of working with the military and veterans. *Id.*

26

However, "this Court has found that experience is not equivalent to qualification . . . unless that experience is mandatory." *Edmonson v. Thompson*, No. 5:19-cv-1163-LCB, 2021 WL 4326993, at *5 (N.D. Ala. Sept. 23, 2021) (citing *Mims,* 2015 WL 6081200, at *7). In addition, Mr. Robinson's argument disregards Defendants' statements that his prior experience was not dispositive. Defendants sought the most qualified, not the most experienced, candidates, prioritizing prior interpersonal experience such as Carter's experience as a deputy and youth minister and Gutierrez's time working with California DSS. *See supra*. Although Mr. Robinson received the highest scores of any candidate on the interview questions addressing experience, (doc. 25-16 at 40–41), this did not outweigh other considerations. And "[a]sking the Court to find that [his] score was too low is a paradigmatic example of quarreling with the selection process." *Edmonson*, 2021 WL 4326993, at *6.

Third, in a related argument, Mr. Robinson points to inconsistencies in Edgil and Williams's reasoning as evidence of pretext. He argues that Edgil first "essentially argue[d] Robinson was overqualified"[5] but that Edgil then changed tack and testified that he did not give Mr. Robinson a low score due to any concerns that he was overqualified. (Doc. 27 at 38; Doc. 25-14 at 43). This argument too is

---

[5] There is precedent in the Eleventh Circuit that candidates' overqualification for a position can be a legitimate, non-discriminatory reason for non-selection. *See generally Woody*, 885 F.2d at 1561; *Soliman v. City of Tampa*, No. 8:06-cv-2039-T-TGW, 2008 WL 1931320, *11 (M.D. Fla. May 2, 2008).

unpersuasive. While Edgil testified that he did not score Mr. Robinson low because of his previous experience with federal employees, that does not prove the corollary that Mr. Robinson's overqualification did not play any role in Edgil's scoring. While Mr. Robinson's prior experience did not count *against* him in the interview, it also did not *add* points or value to his interview. (*See* Doc. 25-14 at 55). Mr. Robinson continues to argue throughout his brief that his experience should have ranked him higher, but Defendants testified to the importance of customer service experience when hiring for the Position. (*See, e.g.*, Doc. 25-14 at 53; Doc. 25-12 at 26). And Mr. Robinson may not quarrel with the weight that the interviewers gave to different experiences and skillsets. *See Edmonson*, 2021 WL 4326993, at *6.

Fourth, Mr. Robinson argues that procedural irregularities in the interview process indicate pretext. (Doc. 27 at 37). ADVA generally provided interviewers with a list of twelve interview questions, and interviewers were instructed to ask all twelve questions to each candidate. (Doc. 25-17 at 13–14, 33–34; Doc. 25-15 at 45). This policy is referred to as the "Marsh Memo." *Id.* at 31–32. Edgil and Williams were provided with these twelve questions in preparation for Mr. Robinson's interview, but they only asked Mr. Robinson five or six of them. (Doc. 25-21 at 12). While it is true that "[d]epartures from normal procedures may be suggestive of discrimination," *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985), this violation of the Marsh Memo was not a departure from normal procedures. Edgil

testified that he had been with ADVA for more than ten years, (doc. 25-14 at 8), and had been involved in interviews for similar positions for the past nine years, *id.* at 17. Edgil testified that the seven interviews to fill the Positions were consistent with his experience conducting interviews for filling similar positions in the past nine years, during which time ADVA had not strictly abided by the Marsh Memo. *See id.* Additionally, the evidence suggests that each of the seven interviews, including Mr. Robinson's, lasted approximately the same amount of time. *See* Doc. 25-16 at 20 (staggering the morning interviews in forty-five-minute intervals); Doc. 25-19 at 25 ("[W]e would take a break in between people."); Doc. 25-21 at 12 (stating Mr. Robinson's interview lasted 30 minutes). This demonstrates that Edgil and Williams's failure to follow the Marsh Memo with respect to Mr. Robinson[6] was consistent with their treatment of white interviewees and thus does not support an inference of discriminatory intent.

Because Mr. Robinson cannot show that Defendants' legitimate, nondiscriminatory reason for not hiring him was actually a pretext for racial discrimination—in other words that "discrimination was the real reason," *St. Mary's*

---

[6] Defendants contend that there is not enough evidence to determine whether or not they followed the Marsh Memo. (Doc. 29 at 6–7). Although Mr. Robinson initially stated he was "only asked five or six questions," when pressed, he could not remember either the number of questions asked or which questions the interview panel asked. (*See, e.g.*, Doc. 25-21 at 23 ("[T]hey only asked me five or six questions. I don't remember the exact number.")); *id.* at 14 ("I don't remember them asking me that. They very well could have, but I just don't remember.").

*Honor Ctr.*, 509 U.S. at 515—his claim fails under the *McDonnell Douglas* burden-shifting framework.

### B. Convincing Mosaic Analysis

For the reasons stated above, Mr. Robinson's claim fails under the *McDonnell Douglas* burden-shifting framework. The court will therefore analyze the facts under an alternative test—the convincing mosaic analysis. Under this approach, "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a [factfinder] to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1328 (11th Cir. 2011) (internal quotation marks and brackets omitted). Under this analysis, a plaintiff can avoid summary judgment if he presents evidence creating a "reasonable inference" that he was discriminated against based on his race. *Id*. But the convincing-mosaic test is not an end-run around *McDonnell Douglas*. Rather, "*McDonnell Douglas* and the 'convincing mosaic standard' are two ways to approach the same question: whether the plaintiff has put forward enough evidence for a reasonable [factfinder] to conclude that illegal discrimination occurred." *McCreight v. Auburn Bank*, 117 F.4th 1322, 1334 (11th Cir. 2024) (finding that the plaintiff failed to put forth enough evidence, under either test, for a reasonable factfinder to conclude that illegal discrimination occurred). As a matter of law, Mr. Robinson has not done so.

In claiming that summary judgment is improper under the convincing mosaic analysis, Mr. Robinson relies on the same four arguments that he relies on to demonstrate pretext. (Doc. 27 at 40). But, as explained *supra*, the facts underlying these four arguments do not give rise to an inference of intentional discrimination. Therefore, Mr. Robinson's argument based on the convincing mosaic approach cannot succeed.

Because Mr. Robinson cannot prove racial discrimination using either analysis, his claims for racial discrimination under the Equal Protection Clause and Section 1981 via Section 1983 necessarily fail as a matter of law. And because Mr. Robinson cannot prove that Williams and Edgil acted with racial bias, there is no underlying claim upon which to base a claim for cat's paw liability against Davis, Newton, and ADVA. *See Reed v. Forney Indus., Inc.*, 800 F. App'x 782, 788 (11th Cir. 2020) ("A plaintiff may prove cat's paw liability by showing that an unbiased decision-maker was influenced by or acted on the recommendation of a biased subordinate."). Thus, Robinson has failed to meet his burden under either *McDonnell Douglas* or the convincing mosaic standard, and all of his claims fail as a matter of law.[7]

---

[7] Because Robinson's claims fail as a matter of law, Defendants' arguments on but-for causation and qualified immunity are moot. (*See* Doc. 26 at 36–37, 40–44).

## CONCLUSION

For the reasons stated herein, the court **GRANTS** Defendants' motion for summary judgment, (doc. 24), and **DISMISSES** the case. A separate judgment will be issued along with this opinion.

**DONE** and **ORDERED** on March 9, 2026.

**HAROLD D. MOOTY III**
UNITED STATES DISTRICT JUDGE